## Cassinelli v. Holliday.

## Holliday v. Cassinelli.

Rehearing Denied January 16, 1950.

October 17, 1950.

Jean A. Auxier, Judge.

W. E. Faulkner, Faulkner & Faulkner for Tony Cassinelli and Charles Cassinelli.

C. A. Noble for Tolbert Holliday.

VAN SANT, COMMISSIONER—Affirming.

The suit was instituted by Tolbert Holliday to recover a commission for services allegedly performed pursuant to a contract with Tony Cassinelli and his brother, Charles Cassinelli. At the close of all the evidence, the Court directed the jury to find for Charles but submitted the case as to Tony. Judgment was entered upon a verdict against Tony in the sum of $7,-700.00 and from which the latter has appealed. Holliday has appealed from the judgment dismissing his petition against Charles. Holliday's appeal against Charles was designated "cross-appeal"; but, since all the parties are before the court and have presented their contentions by brief, we will treat it as having been filed independently, as it should have been, and consolidated in this Court with the appeal first above styled. Accordingly, we will dispose of the two appeals in the one opinion.

Prior to September, 1946, certain persons residing in the state of West Virginia and doing business under

the firm name of Midelburg and Hyman owned a block of business buildings in Hazard, Kentucky. These buildings, nine in number, were occupied by various tenants, two of whom, as partners, are Tony and his brother Charles Cassinelli. They operated a motion picture theater under the management of Tony; a second theater was operated by them under Tony's management in Hazard; and a third was located in Mullins, West Virginia under the management of Charles. In September, 1946, appellant and Edgar A. Dixon, a tenant of another of the buildings, were informed that Midelburg and Hyman intended to sell their holdings in Hazard. They decided to attempt to purchase the property but neither felt that he could negotiate satisfactorily with the owner, consequently they agreed to engage the services of Holliday, who was intimately acquainted with the agents of the owners, to act as their agent in an endeavor to purchase the property. Pending negotiations, no limit was placed on the amount to be paid for the property but there was a complete understanding between all the parties interested in the purchase that Holliday should be paid a commission of three per centum of the purchase price of the property, if a purchase should be consummated. This agreement was entered into between Holliday and Tony on Saturday, September 7, 1946, and was acquiesed in by the others on later occasions. Mr. Holliday, by telephone, arranged to meet S. J. and A. B. Hyman, agents of the owners, at their offices in Huntington, West Virginia on the following morning. He and Mr. Dixon immediately drove to Huntington and conferred with the Hymans at the time appointed. The latter, sensing or learning that Tony was the responsible and moving force in the proposed purchase, insisted on his presence during the negotiations and the meeting was adjourned until the following morning, Monday, September 9th. Tony was present at the adjourned meeting at the conclusion of which, he, Dixon, and appellee (signing his name as "agent") submitted a written offer to pay $240,000.00 for the properties, and, as evidence of good faith, paid to the Hymans, taking their receipt therefor, the sum of $10,000.00 to be applied as a down payment on the purchase price of the property in the event the offer should be accepted. The $10,000.00 in its entirety was furnished by Tony Cassinelli. In the meantime;

to-wit, the night of September 8th, Tony enlisted two other tenants as prospective partners in the proposed purchase, neither of whom signed the written offer although both were present and agreed to it at the conference held on September 9th.

On the 12th and 13th days of September, Tony, Charles, and S. J. Hyman attended a convention of operators of motion picture theaters in Charleston, West Virginia. On the last day of the convention, Hyman told Tony in the presence of Charles that the offer of $240,000.00 likely would be rejected because a higher one had been received. Thereupon Tony conveyed to Charles complete information concerning the transpired transactions, and four days later, September 17th, Charles traveled to Huntington when and where he conferred with Mr. Hyman to obtain permission to bid for the property. Obtaining such permission, he made an offer of $259,600.00 which was reduced to writing October 3rd, signed by Charles on October 4th, and delivered to the Hymans on October 5th. A carbon copy of the offer was mailed to and received by Tony. This offer was accepted, the $10,000.00 deposited by Tony on his previous bid was applied as a deposit on the bid submitted by Charles and later as a down payment on the purchase price, and the deeds consummating the sale were made to Charles and Tony, jointly, who thereupon became the owners of the real estate involved. The $240,000.00 bid was not formally rejected until October 14, 1946, which was ten days after Charles tendered the bid for $259,600.00. The letter rejecting the offer is in the following language:

"Huntington, W. Va.
"October 14, 1946

"Mr. Tony Cassinelli
"Mr. Edgar A. Dixon
"Mr. Tolbert Holliday, Agent
"Hazard, Kentucky

"Gentlemen:

"With reference to your offer of September 9th addressed to me, in which you offer to purchase the property of Midelburg & Hyman and Midelburg Bros. & Hyman in Hazard, Perry County, Kentucky, this offer has been rejected.

"As per your letter of September 14, 1946, signed by Tony Cassinelli, Edgar A. Dixon and Tolbert Holliday, Agent, I am returning the $10,000 to Tony Cassinelli.

"Very truly yours,
"(Signed) S. J. Hyman

"SJH:BW"

The $10,000.00 deposit was not returned but was applied to the purchase of the property under the bid tendered by Charles. On this point Tony testified:

"Q. You directed them to apply your money on the price which your brother had made and which had been accepted? A. Yes sir.

"Q. Now, it has been stated by one of the witnesses in this case from recollection of the matter that the money was returned to you which would imply that it was returned by check or draft, that was a mistake? A. Yes, I never got the money at all. I knew I would have to send it back, so I just instructed them to keep it and apply it to my share of the purchase price."

He further testified that after he received the letter dated October 14th, he "thought they would forward the money right on. A few days went by in the meantime I had heard from my brother about his offer that he had in the purchase of the property and I didn't request the money back, I just left it laying there, it was applied to the purchase price." The letter tendering the bid of $259,600.00 contained the following language: "The $10,000.00 deposited with the offer shall be returned to you if the offer is not accepted on or before October 9, 1949. If the offer is accepted the said deposit shall be credited against the purchase price."

Charles Cassinelli testified that he talked to his brother Tony on the third or fourth of October, at which time Tony agreed to join him in the purchase of the property. These discrepancies will be referred to later in the opinion.

In support of his position that the judgment against Tony should be affirmed, Holliday contends that all of the negotiations commencing with his employment and culminating in the purchase of the property were one continuous transaction on the part of Tony; and in

support of his position that the judgment dismissing his petition avainst Charles should be reversed, he further contends that at all such times Charles was a silent partner of Tony. Tony contends that his contract with Holliday ended when the offer signed by them and Dixon was rejected; and that Charles' acquisition of the property was an entirely separate and distinct transaction and one of which he had no knowledge until after a binding contract had been entered into between Charles on the one hand and Midelburg and Hyman on the other; and since Holliday performed no service in Tony's negotiations with his brother, he is not entitled to the commission agreed on.

In the circumstances above set out, Holliday was employed by Tony Cassinelli as his agent to assist him in purchasing the property then owned by Midelburg and Hyman. No limit was placed on the amount to be paid for the property. The commission to be paid to Holliday was three per centum of whatever the purchase price should turn out to be.

Where a person is engaged as an agent to assist either in the sale or purchase of property and he performs fully all of the obligations imposed on him by the contract, and his principal consummates the purchase of sale with the person the agent has negotiated with, the latter is entitled to his commission. Croxton's Ex'rs v. Henry & Flennor, 193 Ky. 318, 235 S.W. 753, and cases therein cited.

It is admitted that Holliday performed all services required or requested of him by his principal. The sole question for determination is whether Tony Cassinelli was associated with his brother in the purchase of the property from the West Virginia partnership or whether, as he contends, he purchased the property from his brother after the latter became the owner thereof. All negotiations culminating in ownership in the Cassinellis were incidents of the venture Holliday was employed to and did commence and in respect to which he has performed his obligation in full. Charles testified that Tony agreed to become his partner on the 3rd or 4th day of October and both admitted that Charles would not have learned that the property was for sale had it not been for the negotiations participated in by Holliday. After Holliday introduced Tony as

a prospective purchaser and he had been approved by the Hymans, it was definitely understood that Tony could buy the property if his bid was high. Holliday was not concerned with the substitution of persons as partners of Tony. He was concerned solely with the acquisition of the property by Tony, either individually or jointly with others whoever they might have been. The letter containing the offer was written on the 3rd day of October. It was signed by Charles on the 4th day of October and received by the Hymans on the 5th day of October and the offer was accepted by the latter on the 9th day of October. Whilst Tony did not testify as to the specific date he bound himself for his part of the $259,600.00 offer, Charles did; and his testimony was that the date was either the 3rd or the 4th of October. The transfer of Tony's original deposit to secure the good faith of "Charles' bid" and the sending of a carbon copy of the bid submitted by Charles weighs heavily in favor of Holliday's contention that Tony was Charles' partner as early as October 3rd. The only reasonable conclusion which can be drawn from all the evidence is that Tony joined his brother as a bidder for the property in the sum of $259,600.00 previous to the communication of the offer to the Hymans. At that time he had learned that his bid of $240,000.00 "likely would be rejected" but he had not received definite notice of that fact. The effect of Charles' communication was merely to raise the bid of Tony and to substitute the former for Dixon and Tony's other previous associates. The issue under this contention was submitted to the jury and, as we have seen, there was ample evidence to support the verdict.

We think the court correctly dismissed Holliday's petition against Charles because there was no transaction between these parties and there was no evidence that Tony was acting for Charles when he made the agreement to pay Holliday a commission for the services he performed. Even had Charles agreed with Tony to recompense Tony for one-half of the commission, such was not an obligation enforceable by Holliday as it was not a promise to him.

Both judgments are affirmed.